UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SAMMY D. YORK, HENRY H. HOLUBEC, JR., and GREGORY R. HAYES, individually and for all others similarly situated, | ) ) ) ) | No. _____ |
| Plaintiffs, | ) ) ) | ORIGINAL CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY |
| vs. | ) ) | JUDGMENT, AND INJUNCTIVE RELIEF INCLUDING SPECIFIC PERFORMANCE |
| TEXAS A&M UNIVERSITY 12th MAN FOUNDATION a/k/a THE 12TH MAN FOUNDATION, | ) ) ) ) | Application for Temporary Restraining Order to maintain *status quo ante* filed separately and contemporaneously |
| Defendant. | ) ) ) ) | Jury Demanded |

## INTRODUCTION

1.      Plaintiffs bring this action individually and for all those similarly situated who, like Plaintiffs, endowed scholarships pursuant to the Texas A&M University 12th Man Foundation Permanently Endowed Scholarship Program.  Such persons, called "Permanently Endowed Donors," beginning in the 1970s paid large sums of money to the Defendant Texas A&M University 12th Man Foundation (the "Foundation") after having been promised various benefits in return.[1]

2.      When solicited, the Permanently Endowed Donors were promised benefits that included (1) tickets (either free or at face value) to all Texas A&M home football games in the

---

[1] *The Chronicle of Higher Education* has ranked the 12th Man Foundation as the ninth highest in the nation for fundraising for athletes.  "We have the largest endowment in the Big 12."  *See*, September 28, 2007, Minutes of Foundation meeting attached hereto as Exhibit 1.

"best available" seating locations, (2) tickets (either free or at face value) for all away Texas A&M football games, (3) game day parking in the "best available" locations for home games, and (4) other football game-related benefits, all at **no further cost**. These benefits were promised, until about 1992, to be for the lifetimes of the endowed donor and the joint holders of the endowment (usually a spouse or children) or, starting in about 1992, for 30 years.  The seating benefits also were to be continually upgradeable, at no cost, to the "best available" seat location as better seat locations became available through death or attrition.

3.      In 2005, after increasing its fundraising goals, the Foundation concluded that it had made a bad deal with its Permanently Endowed Donors.   Arbitrarily determining that the Permanently Endowed Donors had, as of 2005, received "full value" for their payments, the Foundation began eroding the Permanently Endowed Donors' benefits.

> [T]he sacrifices made by our endowed donors is [sic] exemplary, however, full
> value has been received for these sacrifices.  Integrity demands that we honor these
> contracts for their duration. It should not demand that we memorialize them.

*See* 2005 Parking Report, 12th Man Foundation, p. 15 (attached as Exhibit 2).

4.      The Foundation's long- term strategy was simple: reclaim and resell, at a higher price, the highest value benefits to a "new generation" of Aggie alumni.   In direct violation of the law and the Aggie Code of Honor, ***"[A]n Aggie does not lie, cheat or steal or tolerate those that do[2]"***, the Foundation and those that ran it, deliberately and systematically set out to whittle away

---

[2] The Aggie Code of Honor is an effort to unify the aims of all Texas A&M men and women toward a high code of ethics and personal dignity. For most, living under this code will be no problem, as it asks nothing of a person that is beyond reason. It calls only for honesty and integrity, characteristics that Aggies have always exemplified.

at the agreements it had made with the Permanently Endowed Donors.  The Foundation and those that ran it, deliberately and systematically little by little stole back the benefits to which the Permanently Endowed Donors were entitled.  All of this was, by the Foundation's own admissions, driven by the desire for "cash."  The Foundation's actions included:

(1) discontinuing the practice of providing preferred seating to Permanently Endowed Donors at away games;

(2) requiring Permanently Endowed Donors to pay substantial sums to upgrade seat locations when better seat locations for home games became available;

(3) allocating game day parking exclusively through its new fundraising-enhancing system called the Priority Point Program, effectively dispossessing large numbers of Permanently Endowed Donors of "best available parking" unless they paid more money to the Foundation;

(4) charging Permanently Endowed Donors an annual parking fee;

(5) allocating away game tickets using the Priority Point Program, effectively dispossessing some Permanently Endowed Donors of the ability to purchase away game tickets that were in high demand;

(6) charging Permanently Endowed Donors service fees on tickets;

(7) designating the Arkansas game in Dallas a "neutral site" game in an effort to avoid its obligation to provide, at no added cost, preferred seating to Permanently Endowed Donors; and,

---

The Aggie Code of Honor functions as a symbol to all Aggies, promoting understanding and loyalty to truth and confidence in each other.  http://aggiehonor.tamu.edu.

(8) most significantly, taking away the Permanently Endowed Donors established seat locations for home football games under the Kyle Field Reseating Process, forcing Permanently Endowed Donors either to accept inferior seating locations or to pay large sums of money, effectively dispossessing Permanently Endowed Donors of their established seat locations for the duration of their endowments, all in violation of the promises made years ago to these alumni in order to induce their large payments to the Foundation.

5.      In 2013, the Foundation announced its Kyle Field Redevelopment and Reseating Plans.  The Reseating Plan calls for the "reseating" of the entire stadium, including Permanently Endowed Donors, despite the Permanently Endowed Donors having established seat locations (e.g., west side, second deck, south 45 yard line, row 13) for the duration of their endowment.  Seat locations are described, correctly, with specific reference to Permanently Endowed Donors, in one Foundation document, as "a lifetime seat location."  See *Affidavit of Claude M. McQuarrie III*, (Exhibit 27-A).

6.      The Reseating Plan is mandatory.  It requires payments of both "Capital Campaign Gifts" and "Annual Seat Contributions" in the tens of thousands of dollars (totaling $45,000 per seat for just the next 15 years, in the above example).  It also requires all members and Permanently Endowed Donors to compete financially for seat locations in a Seat Selection process, whereby those with the most contributions to the Foundation have highest priority in seat selection.

7.      The "Seat Selection" phase of the Reseating Plan will begin on March 16, 2015, when those having the highest priority point rankings will begin choosing their seats in the new, redeveloped Kyle Field.  In that process, Plaintiffs and those similarly situated will lose their

established seat locations, regardless of the outcome of this suit, unless this court intervenes.

8.      The Foundation's Reseating Plan will destroy vested, lifetime (or in some instances, limited term) rights under approximately 450 endowments representing approximately 1700 of the 102,512 seats in the Redeveloped Kyle Field.

9.      Plaintiffs respectfully ask the Court to act on an expedited basis to certify an injunctive class of the Permanently Endowed Donors holding rights to seating locations in Kyle Field established before the creation of the Priority Points Program and to preserve the *status quo ante* by enjoining immediately the application of the Seat Selection process to the Permanently Endowed Donors which otherwise will rob them of their established seat locations.

10.     Class certification is appropriate both because Plaintiffs' rights arose uniformly and are being eroded uniformly, and also because this action meets the other requirements of a Rule 23(b)(2) injunctive class seeking incidental monetary relief.

11.     Plaintiffs' established seat location rights are as unique as real estate because they are location rights.  Injunctive relief is appropriate because substitute seat locations available to Plaintiffs and the putative Class are unarguably inferior and different from the unique (and superior) ones they purchased.   Additionally, monetary damages are impossible to measure, as the (substantial) amount of additional contributions required of Permanently Endowed Donors to retain their established seating locations is uncertain, if retaining an established seating location is possible at all, under the Foundation's Reseating Plan.  Thus, Plaintiffs will be irrevocably harmed unless the Court enjoins Defendant's application of the Seat Selection process to the Permanently Endowed Donors in its attempt to reseat Kyle Field.  The Reseating Plan and particularly its Seat Selection process, with embedded Priority Point ranking, eradicates the rights of the Plaintiffs and

the proposed Class of Permanently Endowed Donors, and money damages would be an inadequate remedy for the loss of their established seating locations to other donors.

12.     However, incidental damages are appropriate for those established Permanently Endowed Donors who have had to make additional payments in attempts to retain their established seat locations and parking privileges to which they were already entitled *for free* and *for life or for the remaining term of their permanent endowment*.

## PARTIES

13.     Plaintiff Sammy York is a resident of Kilgore, Texas. As detailed in his affidavit attached hereto as Exhibit 3, Mr. York is a 1974 graduate of Texas A&M University (TAMU).  As a football fan, and supporter of TAMU, Mr. York has enjoyed since he was a child, for some fifty years, attending home and away Aggie football games.  Attending Aggie football games is not only his hobby; it is his passion.

14.     In 1983, Plaintiff York requested and received a brochure from The Aggie Club, an organization that administered football ticket sales for TAMU.   That brochure contained information about a program that interested him then called the 12th Man Permanently Endowed Scholarship Program. The brochure said that an endowment would cost $30,000, which he understood would be a four seat endowment.  It also indicated the "endowed" seating area in the stadium, Kyle Field, to be sections 208 and 209, which he knew to be on the west side, second deck, straddling the 50 yard line.  Still further, it contained a diagram of the parking areas, which showed among others "Lot A Reserved," the lot contiguous to the west side of the stadium.  The verbiage on the same page as the diagram said that Lot A Reserved was used for priority parking

for the "Endowed" level of contributors.  A copy of the brochure is attached to Mr. York's affidavit as Exhibit "3-A."

15.    Mr. York conferred with the Foundation's Executive Director Mr. Green, who related that "best available" seating and parking benefits at Kyle Field for home games and free tickets to away games could be purchased for a $30,000 payment to the Foundation. As he was already familiar with Kyle Field, the quality of the parking benefit was important because the location he described (Lot A) was generally known to be the closest to, and contiguous with, the west side of Kyle Field, where Mr. York wanted to sit.  Mr. York was also impressed with the prospect of moving his existing seating location to the best available location on the second deck on the west side.

16.    After discussing it with his wife, in reliance upon what he had read in the brochure and the information that Mr. Green had provided, and because he wanted to help the Aggie Club and TAMU affiliates at a time of need for them, Mr. York and his wife decided to enter into the agreement with the Foundation to become Permanently Endowed Donors in 1983 and over the next few years made payments toward the endowment.  Mr. York's endowment is identified by the Foundation as No. 13791.

17.    On June 10, 1988, the Foundation confirmed the terms of the 12th Man Permanently Endowed Scholarship to Mr. York in a letter from Arno Krebs, Jr., then acting President for the Foundation:

> "Our records show that you have paid $17,604.00 toward the $30,000 commitment you made in 1983 for the 12th Man Permanently Endowed Scholarship.  At the time of your commitment, the endowment was to be fully funded in three years. Since that time, you have received benefits amounting to four complimentary tickets to all A&M football games, buffets at home football games and parking at all the home games.  This was the commitment of the Aggie Club."

See Exhibit 3-B.

18.     Mr. York, by agreement with the Foundation, thereafter reduced his endowment to a two seat endowment, which cost only $20,000, and he thereafter paid the balance then owing. After upgrading his initial seating locations at no cost (as he had been promised), Mr. York and his wife's home game seat locations became established as Section 208, Row 13, seats 7-8, on the west side, second deck and on about the south 45 yard line. Mr. York and his wife used those tickets through the 2014 season.  They had a clear sightline and proximity to the entire field that makes them superior to most other seats in the stadium. They are superior to seats on the north, east and south sides also because of the afternoon sun angle.  Being on the south 45 yard line, on the 13th row on the second deck of the west side, the seat locations are unique and valuable.

19.     In October 1991, the Foundation sent a letter to Mr. and Mrs. York signed by Harry Green, Jr., then its Executive Director, that re-affirmed the "benefits of your $20,000.00 (2 seat) endowment [are to be] honored during the lifetimes of Sammy York and/or Cherisa York…"  The Foundation asked the Yorks to sign and return the letter to confirm the agreement since the 12th Man Foundation's Permanently Endowed Scholarship program was being reviewed to ensure that "our agreement made in 1983" is in order."[3]  *See*, Exhibit 3-C.  The Yorks complied with this request.

20.     In 2013, the Defendant announced a $450 million Kyle Field "Redevelopment" Plan, to be funded in part by a "Reseating Plan."  The project's goal included building "the greatest venue in the history of college football."  *See,* Exhibit 3-E. The location of the seats for which Mr.

---

[3] Upon information and belief, this letter was sent to ALL Permanently Endowed Donors.

York was promised in 1983 lifetime tickets (sections 208 and 209) corresponds to the redeveloped Kyle Field section that is called the "Prime West Legacy Club."

21.     In July 2013, the Foundation informed Mr. York that it believed it may honor the endowment agreement through the Foundation's Reseating Plan, which would cost Mr. York and his wife additional paymentss to the Foundation totaling $90,000 for the first 15 years.  See York Aff. ¶27 (Ex. 3). However, these additional payments would not guarantee Mr. York what he bought from the Foundation in the year 1983 and enjoyed continuously without making additional payments through the year 2014.

22.     In the imminent, Seat Selection process, beginning on March 16, 2015, the seats in the location corresponding to Mr. York's established seat location, unless first set aside pending the outcome of this suit, will be selected and become obligated to whomever selects them.  This is because Mr. York's Priority Point ranking (as reported by the Foundation) is relatively low for a prime seating section.  York Aff. ¶¶30-32 (Ex. 3).

23.     According to the Foundation, Mr. York's priority point ranking within the Prime West Field Box section (directly below, on the first deck, and which he was forced in 2013 to select because he could not afford the Prime West Legacy Club) was 90/123, with the result that (again, according to the Foundation) 82% of the seats in that section will have been chosen when it is Mr. York's turn to select). *Id.*

24.     Mr. York expects that his ranking in Prime West Legacy Club, were he there for seat selection, would be as low or lower.  Accordingly, in Prime West Legacy Club, Mr. York would instead end up with a seat location nearer the 35-yard line, on a less preferable (high) row, which would not be comparable to his established seat location (45 yard line, row 13). *Id.* ¶30.

25.     Plaintiff Henry Holubec is an individual who resides at College Station, Texas.  As detailed in his declaration attached hereto as Exhibit 4, Mr. Holubec is a former Executive Committee member of the Foundation. In the year 1985, Plaintiff Holubec contracted with the Foundation through its then Executive Director Harry Green to endow four seats to obtain free Texas A&M University football game tickets in the best available location for life at home and away games with a pledge and ultimate payment of $30,000.   Mr. Holubec's endowment is identified by the Foundation as No. 11654.   Holubec Aff. at 1-2 (Ex. 4).

26.     Mr. Green promised Plaintiff Holubec that thereafter there would be no further cost, with the tickets for all games, home and away, and the pre-game buffet, being "complimentary" (meaning no charge beyond the endowment payment). *Id.* at 2.

27.     Mr. Green made no mention to Plaintiff Holubec of any required incentive program, such as the Priority Point Program that was later announced by the Foundation in 2006, about 21 years after his endowed scholarship agreement was made in 1985. Mr. Green made no reference to any such program or similar mechanism whereby Plaintiff Holubec would have to compete financially with others for the benefits he purchased from the Foundation in 1985. *Id.*

*28.*     Beginning with the 1985 football season, Mr. Holubec and his wife received the benefits that had been described by Mr. Green, including without further charge tickets for home and away games, and parking in Lot A for home games. That continued through the 2014 season. The Holubec's home game seat locations have always been Section 107, Row 23, seats 1-4, on the west side, first deck and between about the 48-50 yard lines. This location has a clear sightline and proximity to the entire field that makes them superior to most other seats in the stadium at Kyle Field. They are superior to seats on the north, east and south sides also because of the afternoon

sun angle.  Being between the north 48 yard line and the 50 yard line, on the 23rd row on the first

deck of the west side, the seat locations are unique, valuable and irreplaceable. *Id.*  However, under

the Foundation's Reseating Plan, Mr. Holubec will have to pay approximately $42,000 for less

desirable seats.  *Id.* at 3-4.

29.     Plaintiff Gregory Hayes and his wife purchased a four seat endowment from the

Foundation in 1980 for $30,000.  *See* Affidavit of Gregory R. Hayes attached hereto as Exhibit 5.

Mr. Hayes' established seating location is West Side, Second Deck, Section 208, Row 9, Seats 6-

9, approximately on the south 43 yard line.  He, too, contracted with the Foundation through its

Executive Director Harry Green.  Hayes Aff. ¶3-10 (Ex. 5). His initially assigned parking space

was in Lot A, but he was reassigned to Lot H in 2014 because of the Foundation's Priority Point

Program. *Id.* ¶11.  Mr. Hayes cannot afford to pay and does not want to pay the cost of additional

payments for "comparable" tickets located in the second deck and will lose his south 43-yard line

seats under the Foundation's Reseating Plan. Mr. Hayes' endowment is identified by the

Foundation as No. 11511. If he were to have any chance of obtaining seats comparable to his

established seats, Mr. Hayes would have to pay $180,000 for the first 15 years of the Foundation's

Reseating Plan. *Id.* ¶19.  He calculates the total cost of comparable seats for his life expectancy

will cost $280,000, not including the incalculable additional payments required to keep him

competitive in the selection process vis-à-vis other donors. *Id.* ¶22-24.  If he "loses" his Endowed

Donor status for any reason, Mr. Hayes estimates that he would have to pay $570,400 to obtain

comparable benefits remaining over his remaining lifetime, *id.* ¶25, if that is even possible to do.

*Id.* ¶¶26-28.

30.     Defendant Texas A&M University 12th Man Foundation is a Texas non-profit

corporation, which was originally incorporated on April 5, 1950, as "The Aggie Club." Defendant

may be served with citation herein by serving its registered agent for service of process, Randel L.

Howard, at Joe Routt Blvd. at Clark Street, Texas A&M University Campus, College Station,

Texas 77843.

## II.   JURISDICTION

31.    The Court has original jurisdiction over this action because the matter in

controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class

action in which members of the class of plaintiffs are citizens of a State different from Defendant.

28 U.S.C.A. § 1332(d)(2).

## III.  VENUE

32.    Venue in this district is proper pursuant to 28 U.S.C.A. § 1391(b) (2) because a

substantial part of the events or omissions giving rise to Plaintiffs' claim occurred here.

Specifically, Mr. York paid a substantial portion of his endowment purchase price in 1985, when

he resided in Marshall, Texas.

## IV.  CONDITIONS PRECEDENT

33.    All conditions precedent have been performed or have occurred as required by

contract or law.

## V.  COMMON COURSE OF CONDUCT BY 12TH MAN FOUNDATION

34.    Defendant 12th Man Foundation was organized in 1950 to aid and assist worthy

individuals obtain an education at Texas A&M University.  Its most recent of several restated

articles of incorporation indicates that the Foundation is organized to operate exclusively for

charitable purposes to make expenditures to or for the support or benefit of Texas A&M

University, including providing scholarships to men and women who attend Texas A&M University.

35.     According to the sworn deposition testimony of Frank Shannon, Executive Director of Defendant 12th Man Foundation,[4] who worked there in various capacities between 1991 and 1997, the purpose and main activity of the Foundation is fundraising from donors.[5]  In the 1980s, the Foundation solicited alumni in person and made oral endowment contracts with them that were memorialized in letters to Permanently Endowed Donors in October 1991. Starting in 1994, the Foundation offered to potential donors the opportunity to purchase endowments that included the right to purchase at "face value" (i.e., without a premium charge) two endowed seating area football season tickets for home and away games, along with privileges in the endowed parking area for thirty years, for $20,000.[6] Four seat endowments were available for a price of $40,000.[7]

36.     The agreement terms, including the amount of the required payments and the payment terms, were all authorized by the Foundation's Executive Committee and were the acts of the Foundation.[8] The written agreements made no mention that additional payments might be later required in order to continue enjoying the offered benefits.[9]  In these written agreements, the "endowed seating area" and "endowed parking area" were not indicated graphically or otherwise defined.  Nor, was it stated that the Foundation's Executive Committee had the right at any time to define or redefine these terms.[10]

---

[4] Mr. Shannon's deposition was taken in *Tullos v. Texas A&M University 12th Man Foundation*, No. 2011-70365 (152nd Dist. Ct., Harris Cty, Tex. May 28, 2014).  Excerpts of the transcript of Mr. Shannon's deposition are attached hereto as Exhibit 6.
[5] Shannon Dep. 314:10-13.
[6] *Id.* 225:17-23
[7] *Id.* 58:15-19.
[8] *Id.* 64:4-12.
[9] *Id.* 73:4-74:2.
[10] *Id.* 64:13-21.

37.     Instead, in 1994 (unlike in some prior years, when brochures specifically depicted the endowed seating area and the endowed parking area, as in the case of Mr. York), the only source of information about the meaning of "endowed seating area" and "endowed parking lot" was the Foundation's Development Staff, who sold the endowment plan.[11]  Prospective endowed donors were informed by the Foundation's Development Staff both about the available seat locations and the parking location from which the donor could pick at the time of his or her endowment.[12]  This Development Staff uniformly and consistently represented to potential donors that their endowment entitled them to (1) the seat location of their choice from those then available, (2) and that the seat location they selected and priority parking were theirs for the terms of their individual Permanent Endowment Agreement.[13]  (Indeed, for a period of years, the Foundation placed the endowed donors' names on their seats at Kyle Field, and for those parking in Lot A, on their assigned, reserved parking places.)[14]

38.     The Foundation's Development Staff also consistently represented to potential donors that they could upgrade their seat location without additional charge as other endowed locations became available and based on the seniority of the endowed donor.[15]  (In contrast, non-endowed donors had to make additional payments to improve their seating to a location outside the area specified for their level of contribution.[16])

39.     As a result of the Foundation's solicitation of endowment payments, Plaintiffs and

---

[11] *Id*. 70:3-19.
[12] *Id*.70:12-19.
[13] *Id*. 50:15-21.
[14] *Id*. 79:10-19.
[15] *Id*. 220:1-18.
[16] *Id*. 200:25-201:1-7

members of the Proposed Class entered into oral[17] and written endowment contracts.[18]  The contracts are uniform because, according to former Executive Director (from 1977 to 1992), Harry Green, they were produced from a template.[19]   The Permanently Endowed seat location and priority parking donor program was an integral part of the Foundation's fundraising efforts between 1994 and 1997, and it "dramatically" increased[20] the amount of the Foundation's fundraising during that period.

40.    Since this time, at least one new campus building has been built on more than one of the parking lots containing priority spaces for the Permanently Endowed Donors. Now, Kyle Field is in the process of being redeveloped.  The attendance both at Texas A&M University and at Texas A&M football games has increased.

41.    As the premium seat locations and priority parking spaces thus became more valuable, the Foundation began to erode the benefits bargained for by the Permanently Endowed Donors so that it could attract new and additional payments. Ultimately, the Foundation created a rewards and incentive structure "for the next generation of the 12th Man donors," but it did so at the expense of Permanently Endowed Donors. *See* Aggie Access Priority Point Program described on the Foundation's website page printed at Exhibit 8.

42.    There are numerous writings which ratify the terms of the Permanently Endowed Donors agreement.  For instance, in December 1991, the Foundation elected to "modify" the football seating and parking policy for 1992.  A letter was sent to all members (including donors

---

[17] Oral agreements were subsequently ratified in writing in numerous documents.
[18] Green Dep. 28:14-23, 29: 3-18 Excerpts of the transcript of Mr. Green's deposition are attached hereto as Exhibit 7.
[19] *Id.* 110:23.
[20] *Id.* 76:16.

AND to all Permanently Endowed Donors).  *See,* Exhibit 9.  The letter *again* confirmed the rights of the Permanently Endowed Donors to their "established" seating locations and it reassured the Permanently Endowed Donors that their seating locations would "not be affected by this policy." *Id.*

43.     Over time the Foundation realized that it could make more money from the Permanently Endowed Donors' benefits if it could just get them back and resell them.   A special committee called the Endowment Subcommittee was formed to study the matter, and the Foundation began chipping away at the "problem" presented by these permanent endowments. On June 22, 2004, the Endowment Subcommittee issued its recommendations to the Foundation's Executive Committee. *See,* Exhibit 10, June 22, 2004 Memorandum to Executive Committee. Previously, the Executive Committee had decided to initiate a buy-back program which was to commence in the fall of 2004.  The program sought to buy-back Permanently Endowed Donors' endowments so that they could be "resold to new endowed donors." *Id.*  The Endowment Subcommittee issued its opinion that the "endowment repurchase by the 12th Man Foundation belongs to the 12th Man Foundation and can be resold to new endowed owners." *Id.*  Ultimately, the Foundation was successful in getting eighteen (18) Permanently Endowed Donors to agree to the buy-back. *See*, Exhibit 11, September 6, 2013 Minutes of Foundation meeting.   In the same meeting in June 2004, the Endowment Subcommittee:

> "…agreed to recommend to the Executive Committee that no upgrade in seats for existing endowed donors will be allowed with any vacancies that occur in endowed donors (sic) seats.  However, the committee also recommends that if an endowed donor has a written agreement which states otherwise the written agreement will be honored by the 12th Man Foundation."

Exhibit 12. This recommendation, which was adopted by the Foundation, was a deliberate breach

of the Foundation's agreement with the Permanently Endowed Donors.

44.    In March 2005, the Foundation again confirmed the terms of its agreements with the Permanently Endowed Donors.  Mr. W. Miles Marks, Executive Director and CEO of the Foundation wrote to Neal (the last name is redacted) and asked him to sit on a Task Force that would create a priority system of "allocating parking, season tickets, road game tickets, suites, club seats, and bowl game tickets," which the Foundation thought had not heretofore been clearly defined.  *See*, Exhibit 13.  However, Mr. Marks made it clear that the Permanently Endowed Donors' seat locations are "grand-fathered" and will remain "intact and will not be affected by this system."  He also confirmed the Permanently Endowed Donors' rights to "prime parking spaces around Kyle Field..." *Id.*, at 2.

45.    Driven by the desire for cash, the Executive Committee created the Priority Point System.  *See*, Exhibit 14.   In 2006, the Foundation announced the adoption of its new "Priority Point Program."   Under that program, which became effective in about 2007, Foundation members receive credit in the form of "Priority Points" in return for their contributions (one point per $25) to the Foundation, as well as for such things as years of continuous giving, a one-time credit for being a Permanently Endowed Donor, and others.  The Foundation then would allocate benefits such as priority for away football games, home football parking, and seating at  basketball and baseball games (and other sports), tickets for conference and NCAA tournament events, and other benefits as determined by the Executive Committee, on the basis of a donor's Priority Point total and ranking relative to all other members.

46.    At this time, and contrary to the recommendation of the committee formed to study the issue to "grandfather" the Permanently Endowed Donors to the extent of their benefits, the

Foundation decided to apply the Priority Point Program to parking benefit allocation for all members.  It took this action despite its actual knowledge that doing so would conflict with the Permanently Endowed Donors' parking benefits, which in the cases of two of the three named Plaintiffs resulted in their loss of Lot A parking, a breach of their endowment agreements with the Foundation.

47.     The Foundation's own documents show the Foundation acknowledged the existence of "verbal promises" having been made to the Permanently Endowed Donors regarding the right to priority parking.  *See,* Exhibit 15, February 24, 2006 Minutes of Foundation meeting, p. 2.  Furthermore, Foundation documents confirm the existence of the priority parking privilege in ***written*** documents.  *Id.*

48.     Clearly, the Foundation made the fundamental decision that it would no longer honor its commitment for parking benefits to Permanently Endowed Donors.  Instead, effective in June of that year, the Priority Point Program would be implemented and, in the next year, would apply, without grandfathering Permanently Endowed Donors, in violation of their contractual rights.

49.     On April 7, 2006, the Executive Committee met.  Facing the gloomy report of lagging pledges compared to the prior year, the Executive Committee prepared for the implementation of the Priority Point Program.  *See*, Exhibit 16, p. 3.  To implement and protect their February 24, 2006 decision to not honor its commitments regarding priority parking, the Foundation established a priority point appeal process.  *Id.*, at 4.  In doing so, however, it determined that appeals from denials of orally promised parking benefits would be outside the jurisdiction of the appeals panel (and thus rejected regardless of the facts).  It further determined

that the Executive Committee was to give "strong direction to the panel and develop a philosophical position of unappealable items, such as oral promises that lack other supporting documentation. *Id.* The Executive Committee would ratify the appeal panel's recommendations." *Id.*

50.     In August, 2008, the Budget Committee recommended "Arkansas game tickets not be included in the complimentary group for endowments by designating the annual games as a neutral site, similar to bowl games, not a home or road game." *See*, Exhibit 17, August 26, 2008 Foundation minutes. This led to further erosion of the Permanently Endowed Donors' benefits, in breach of the Foundation's contracts with them.

51.     The Foundation, having determined that Kyle Field renovation would be "an opportunity to earn more revenue," created a Priority Seating Task Force which met in 2009 to discuss Foundation documents that "could create problems for reseating." *See*, Exhibit 18, April 3, 2009 Minutes, p. 2. The Foundation discussed the December 1991 letter and acknowledged that "[T]his could be construed that donors could keep the same seats on the lower west side of Kyle Field." *Id.* That is precisely what the Permanently Endowed Donors, who indisputably already had established seat locations for the duration of their endowments, are entitled to.

52.     On August 25, 2011, Mr. Frank Shannon, III, the Executive Director of the Foundation in 1994, provided a signed written statement discussing the terms of the Permanently Endowed Donors agreements. *See*, Exhibit 19. Mr. Shannon's statement confirmed the following regarding the endowments:

> (1) He was involved in soliciting the Permanently Endowed Scholarship Program;
> (2) Depending on the payment, the Permanently Endowed Donors got 2 or 4 seats; and
> (3) Parking privileges offered were in the best available parking area closest to the stadium; and

(4) The benefits would last for 30 years (post 1992).

53.     In 2012, the Foundation confirmed the "[E]ndowments are either lifetime, perpetual or expire between 2014 and 2032."  *See*, Exhibit 20, December 17, 2012 Minutes.

54.     In 2013, the Foundation announced its "Redevelopment" of Kyle Field and a companion Kyle Field "Reseating Process." The redevelopment is a $450 million renovation project undertaken by the Foundation immediately after Texas A&M freshman player Johnny Manziel made history in 2012 by becoming the first freshman to win the Heisman Trophy. According to the Foundation's Kyle Field website, FAQ page, *see* Exhibit 21, the renovation is being done "[B]ecause Texas A&M deserves the finest collegiate facilities and the goal is to build the greatest venue in the history of college football…. A redeveloped Kyle Field will amplify and honor our past and our traditions while expanding the intimidation factor." *Id.*   According to the Foundation's Kyle Field website, FAQ page, the Reseating is necessary "to generate the funding for the project …." *Id.*

55.     A May 17, 2013, letter sent to all Permanently Endowed Donors acknowledges their "charitable endowment contribution" and then proceeds to tell them how their seating locations will be taken away unless they make significant additional contributions.  *See*, Exhibit 22, May 17th Letter.  The Committee Minutes on April 3, 2013, describe the understandably overall disappointment, dissatisfaction and upset by the Permanently Endowed Donors to the planned Reseating.  *See*, Exhibit 23, April 3, 2013 Minutes.

56.     This lawsuit is brought because, despite the Foundation's rationalizations of convenience, the Foundation is breaching its contracts with Plaintiffs.  Plaintiffs' endowments made before about 1992 do not expire during their lifetimes.  Those made afterward expire only

after 30 years.  Under the Reseating Plan, however, Plaintiffs are denied access to the established seating locations that had been promised them unless and until they make additional and continuing annual payments to Defendant.

57.     Immediate relief is necessary because on March 16, 2015, the Foundation will begin its announced Seating Selection process under its Reseating Plan, after which date the Foundation will reassign Plaintiffs' established seat locations (and their parking) and will further eradicate the contractual rights of Plaintiffs and the Class Members.

58.     Unless the Court acts promptly to certify one or more classes of established Permanently Endowed Donors and to enjoin the Foundation's application of the Seat Selection process to the Class, Plaintiffs and the proposed Class will be deprived of their seat locations, priority parking  and other game-related benefits for which they bargained and paid dearly many years ago.

## VI.  CLASS ACTION ALLEGATIONS

59.     This action is brought as a class action under rule 23 of the Federal Rules of Civil Procedure.  The 12th Man Foundation's conduct has been systematic and continuous and has affected large numbers of Permanently Endowed Donors over time.  Plaintiffs bring this class action to secure redress for the 12th Man Foundation's uniform and common practice of eroding established stadium seating, priority parking and other endowment contract benefits through application of its Priority Point Program and through its other actions.

60.     The 12th Man Foundation during the Class Period uniformly has denied Permanently Endowed Donors their established seat locations, their priority parking, seat location upgrades free of additional payments based on their seniority, and other benefits. The 12th Man

Foundation's conduct has been uniform throughout the Class Period, and it has impacted all members of the proposed Class in a common and similar manner to how it affects Plaintiffs.

61.     Plaintiffs and all Members of the proposed Class have fully complied with all endowment contract provisions necessary for them to receive their endowment seat locations, priority parking and other benefits.  Until it adopted its Priority Point Program, the 12th Man Foundation had applied endowment seat locations, priority parking and other endowment benefits to each member of the proposed Class and found that each Class member had fulfilled the requirements for such benefits to apply.  No further performance was required by any member of the proposed Class to secure all available benefits under his, her or its endowment agreement.

62.     Plaintiffs seek certification of the following Class:

INJUNCTION CLASS: All persons with Permanently Endowed Scholarship Program contracts whose established seat locations, priority parking or other endowment benefits, including upgrade rights, are subject to alteration or termination if they do not make additional, continuing payments to Defendant.

As incidental relief for this Class, Plaintiffs seek the refund of all monies paid by Class members as additional payments to the Foundation in order to maintain their established seat locations, priority parking or other endowment benefits, or to upgrade the same, as required by Defendant's unilateral application of its Priority Point Program.

Excluded from the Class are a) any individuals who have filed state court action to address their individual claims and (b) the assigned judge, the judge's staff and family.

63.     Membership in the Class is so numerous as to make it impractical to bring all Class members before the Court.  The exact number of Class members is unknown, but can be readily determined from the records maintained by the 12th Man Foundation.

64.     Plaintiffs believe there are hundreds of persons in the Class and, on information

and belief, that the Class will include approximately 450 Permanent Endowed Donor agreements impacting approximately 1700 seats in Kyle Field.

65.     Plaintiffs are typical of members of the Class.  They each entered into an endowment contract with Defendant before it created and applied the Priority Point Program, paid their subscriptions, and sought and enjoyed benefits under the endowment contract until their benefits were unilaterally eroded without their consent under Defendant's Priority Point Program and by Defendant's other actions common to members of the Class.

66.     There are numerous and substantial question of law and fact common to all of the members of the proposed Class which predominate over any individual issues.  Included within the common questions of law and fact are:

a. Whether the 12th Man Foundation was and is contractually obligated to provide endowment benefits to Plaintiffs and members of the proposed Class.

b. Whether Plaintiffs and members of the proposed Class had or have any further obligations including additional payments necessary to maintain their established endowment seat locations, priority parking or other endowment benefits.

c. Whether Plaintiffs and members of the proposed Class had or have any further obligations including additional payments necessary to upgrade their established endowment seat locations, priority parking or other endowment benefits.

d. Whether the 12th Man Foundation exercised good faith and fair dealing in unilaterally applying its Priority Point Program, and otherwise, to erode the established endowment benefits of Plaintiffs and of the proposed Class.

e. Whether the term of the endowed benefits of Plaintiffs' and of the proposed Class is for the life of the donor or his/her spouse or children, or for a specified term of thirty years;

f.   Whether the 12th Man Foundation breached its endowment contracts with Plaintiffs and the proposed Class by applying the Priority Point Program, or other actions, to erode established endowed benefits.

g.   Whether damages are an adequate remedy for Defendant's breaches of contract.

h.   Whether Plaintiffs and the proposed Class of endowed donors will suffer irreparable harm beginning on March 16, 2015, by Defendant's allowing its Seat Selection process to proceed and under which endowed donors' established seat locations will be taken in a manner as to render them unavailable to Plaintiffs should they prevail on the merits in this suit.

i.   Whether the balance of hardships tips in favor of Plaintiffs and the proposed Class.

j.   Whether considerations of the public interest favor Plaintiffs and the proposed Class of established Permanent Endowed Donors.

67.   Plaintiffs have no interest adverse to the interests of other members of the proposed Class and will fairly and adequately protect the interests of the Class.

68.   Plaintiffs have retained the undersigned counsel, who are experienced and competent in the prosecution of class actions and complex litigation. These counsel have the resources and experience necessary to prosecute this case.

69.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, due to the unilateral application of the Seat Selection process and the Priority Point Program, without consent of Plaintiffs or the proposed Class, the Class members have suffered and will continue to suffer irreparable harm that has no adequate remedy at law, and the 12th Man Foundation's conduct will proceed without effective remedy.

70.     Individual members of the proposed Class have little interest or ability to prosecute an individual action due to the complexities of the issues involved, the costs of assembling proof, the time required, and the immeasurable, although significant, damages suffered by each member of the proposed Class.

71.     This action will allow the orderly, fair, and expeditious administration of Class claims. Economics of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.  Collective adjudication will allow sufficient proof and expertise to be assembled to value fairly and to prove the losses at issue or alternatively to show how losses are unique and unmeasurable.

72.     This action will present no difficulties which would impede its management by this Court as a class action, and a class action is the best available means by which Plaintiffs and the Members of the proposed Class can seek redress for the harms caused to them by the 12th Man Foundation.

## VII. <u>CLASSWIDE CAUSES OF ACTION</u>

### *Breach of Contract*

73.     Plaintiffs and each member of the proposed Class entered into an oral or written form endowment contract with Defendant prior to Defendant's creation and application of the Priority Point Program. Plaintiffs' agreement were all oral, but were memorialized in the Fall of 1991 by the Foundation's letter to all Endowed Donors acknowledging the existence of the contract. A copy of the letter directed to Mr. York is attached as Exhibit 24.  Sometime around 1992, the Foundation began using written agreements when creating new endowments.  A copy of the written agreement between Mr. Tullos and the Foundation is attached hereto as Exhibit 25.

74.     The Foundation's contract provides that Plaintiffs and members of the proposed Class would make large payments ($20,000,  $30,000 or $40,000) to Defendant and that Defendant would provide Plaintiffs and Class benefits that included (1) tickets (either free or at face value) to all Texas A&M home football games in the "best available" seating locations, (2) tickets (either free or at face value) for all away Texas A&M football games, (3) game day parking in the "best available" locations for home games, and (4) other football game-related benefits, all at **_no further cost_**. These benefits were promised, until about 1992, to be for the lifetimes of the endowed donor and the joint holders of the endowment (usually a spouse or children) or, starting in about 1992, for 30 years.  The seating benefits also were to be continually upgradeable, at no cost, to the "best available" seat location as better seat locations became available through death or attrition.  No provision in the contract allows Defendant to unilaterally change these rights of Plaintiffs and of other established Permanently Endowed Donors. Plaintiffs and Class members have performed their obligations under the contract. Defendant, however, has not performed some of its contractual obligations and now threatens further non-performance.

75.     Specifically, Defendant has not allowed Plaintiffs and Class members to keep or upgrade their established stadium seat locations, maintain their priority parking and other benefits without making additional and continuing payments, and Defendant continues to do so. The seating and parking rights of the established endowed donors are location-specific and unique. Defendant's non-performance is a breach of the parties' contract.  As a result, Plaintiffs are entitled to injunctive relief and to damages, as well as payment of their litigation expenses including attorney fees.  Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (8).

### *Declaratory Judgment*

76.     Plaintiffs reallege the allegations contained in previous paragraphs as if fully set forth herein.

77.     Notwithstanding the lifetime or 30 year term of Plaintiffs and Class members' rights under their endowment agreements and that the agreements have no provision under which Defendant may redefine those rights unilaterally, Defendant applied the Priority Point Program in a manner so as to redistribute the established seat location, priority parking and game-related benefits of the Permanently Endowed Donors.  Defendant also acted to diminish certain other benefits of endowed donors.  Defendant refuses to provide Plaintiffs and Class members their established donor benefits unless and until these Permanently Endowed Donors make additional payments and continue to do so annually.

78.     Plaintiffs and Class members contend that, pursuant to their endowment contracts, they are legally entitled to keep and to upgrade their seat locations, and to retain their priority parking and other benefits they had established prior to the advent and application of Defendant's Priority Points Program, and prior to other of Defendant's actions, through the end of the term of their contracts.

79.     Plaintiffs and Class members contend that Defendant's application of its Priority Points Program to the benefits that they purchased, and Defendants other actions, deprives them of the endowment benefits that they bargained for in their endowment contracts.

80.     Because Defendant continues to mischaracterize the rights of the Permanently Endowed Donors under their endowment contracts and continues to claim that it has the right to alter the contracts unilaterally, an actual dispute exists between Plaintiffs and the 12th Man Foundation, which parties have genuine and opposing interests, which interests are direct and

substantial, and of which a judicial determination will be final and conclusive.

81.     Plaintiffs, on behalf of themselves and proposed Class members, seek a judgment declaring that Defendant must specifically perform its contractual obligations by providing them through the end of the lifetime (or thirty year, in the case of those having thirty year agreements) term of their endowment agreements with the seat locations, priority parking, and other benefits that they had established and enjoyed prior to Defendant's application of the Priority Points Program and prior to Defendant's other actions that diminished their benefits and to return any additional payments that Plaintiffs and Class members paid to keep or upgrade their established endowment rights.

### *Injunction*

82.     Plaintiffs reallege the allegations contained in previous paragraphs as if fully set forth herein.

83.     Defendant continues to apply its Priority Points Program, and its other policy changes, to erode and erase the rights of Plaintiffs and Class members under their permanent endowment contracts.  Defendant will apply the Seat Selection process beginning on March 16, 2015, to determine seating locations and priority parking of the Permanently Endowed Donors for the coming 2015 college football season.

84.     Defendant continues to mischaracterize the rights of the Permanently Endowed Donors under their endowment contracts and continues to claim that it has the right to alter unilaterally the contracts of Plaintiffs and Class members.

85.     Defendant continues to deny Plaintiffs and Class members their established seat locations, and their priority parking in the form originally promised, and it continues to deny

upgrades and other benefits unless Plaintiffs and Class members make additional and continuing annual payments.

86.     Unless this Court acts as requested herein, Defendant will continue to mischaracterize the Permanently Endowed Donors agreements and its power to alter the rights of the parties thereunder; it will continue to erode and erase the established endowment benefits of Plaintiffs and the proposed Class; and it will continue to keep payments that it wrongfully and coercively obtained from established endowed donors through the Priority Points Program and other policy changes.

87.     Plaintiffs and Class Members have been injured and harmed by the Priority Points Program and Defendant's other policy changes.

88.     Plaintiffs and Class Members have no adequate remedy at law for these acts and omissions of Defendant.

89.     Accordingly, Plaintiffs and the proposed Class ask the Court to issue preliminary and permanent injunctions that require Defendant to cease and desist in applying the Priority Points Program to their Permanently Endowed Donors with respect to their endowment benefits (including game day parking in the best available lot, and access to away game tickets in a preferred location) and to maintain Permanently Endowed Donors' established seat locations, priority parking and other benefits described herein; and to return any payments that Defendant wrongfully and coercively obtained from Permanently Endowed Donors through the Priority Points Program and other policy changes.  Additionally, Plaintiffs and the Class seek equitable monetary relief to remedy the loss of use of their established endowment benefits.

   *A.  Seating Locations*

90. Defendant's ongoing actions that began in 2013 regarding its announced Reseating process of the Redeveloped Kyle Field will cause probable, imminent, and irreparable injury to Plaintiffs. Accordingly, injunctive relief is necessary to preserve the status quo and to prevent probable, imminent, and irreparable injury.

91. Plaintiffs seek temporary and permanent injunctions requiring Defendant to:

1. Without further charge, provide Class Members their current, established seat location, throughout the remaining term of the endowment contract;

2. Allow Class Members to upgrade their seat locations without further charge, throughout the remaining term of the endowment contract;

3. Reserve, for issuance to Class Members, from the upcoming "seat selection" process for the "Redeveloped Kyle Field," scheduled by Defendant to commence in March 16, 2015, contiguous seats in the number issued the Class Member  upon endowment and in the location that most closely resembles each Class Member's established seat location, *i.e.*, west side, first deck, 23rd row, seats 1-4, 48-50 yard line;

4. Provide Class Members with priority parking without further charge in the best available parking lot at home football games for the duration of their endowment term; and

5. Issue to Class Members, without further charge, away game tickets, including but not limited to Arkansas games set to be played in Dallas, and any other so-called "neutral site" games, in an endowed (*viz.* preferred) seating area, for the duration of their endowment term.

6. Accordingly, Class Members request a temporary restraining order (separately) and a preliminary injunction to preserve their seat locations during the pendency of this suit. Such relief is necessary to prevent Defendant from assigning to any other person the Class Members' seat locations so that, upon trial of this matter, such seat locations will be available and not obligated to any others. Moreover, it is necessary to provide to Class Members their contractual benefits during the pendency of this suit.

B. *Threats and Reprisals.*

92.     Plaintiffs also seek a temporary restraining order, preliminary injunction and permanent injunction to protect them from additional, probable, imminent and irreparable injury. As "endowed donors" and "members" of the Defendant Foundation, Plaintiffs have rights to various benefits such as those discussed above, as well as others such as tickets in preferred locations to other athletic events (*e.g.*, basketball games) at Texas A&M University.

93.     Plaintiffs also seek a temporary restraining order, preliminary injunction and permanent injunction to protect them from retaliation by the Defendant.   On or about February 12, 2015 Defendant, through its agent, threatened Plaintiff Henry H. Holubec, Jr., in an attempt to intimidate him to forsake pursuing his contractual rights. Specifically, Defendant acted through M. Scott Taylor, Defendant's agent and recent Board of Trustees Chair; Taylor is an attorney who has acted for Defendant in the ongoing litigation brought by other endowed donors who are seeking to enforce their contractual rights with Defendant.

94.     Taylor recently approached Mr. Holubec (who is retired and age 75) at a Texas A&M sporting event and threatened him with loss of his contractual benefits. With actual or constructive knowledge that Plaintiff Holubec had retained counsel and was about to file suit against Defendant, and with actual or constructive knowledge of Defendant's request that Plaintiffs refrain from filing suit while discussions between Defendant and various Permanently Endowed Donor claimants were ongoing (and in which Taylor was participating), Taylor instructed Mr. Holubec that, should a hypothetical endowed donor named "Henry" file suit, "Henry" would not only lose the case but he would also be deprived of his endowment benefits and "catch a lot of heat over this." *See* Affidavit of Henry H. Holubec, Jr., attached hereto as Exhibit 4.

95.     In another altercation, Deborah Lawson, the 2013 President of the Houston A&M Club (HAMC), a fund-raising organization, was threatened by Mr. Taylor in April or May 2013. Mr. Taylor advised Ms. Lawson that Defendant would act to deny HAMC access to Texas A&M Athletic coaching to appear at HAMC events if HAMC pursued legal action against Defendant on its three endowment contracts.  HAMC uses as benefits of the endowments as prizes at fundraising events. As a result of Taylor's threat, the HAMC Board voted not to pursue its rights in a court action.  *See* Affidavit of Deborah Lawson attached hereto as Exhibit 26.

96.     Taylor's actions were a deliberate and calculated attempt to intimidate Mr. Holubec and HAMC from seeking judicial enforcement of their contractual rights against Defendant.

97.     By Defendant's actions, Plaintiff Holubec has been placed in fear of probable, imminent, and ongoing retaliation and reprisals, if he pursues his rights made the basis of this suit, in the form of the diminution or total loss of his family's benefits, which are administered by Defendant on an ongoing basis.

98.     Plaintiffs therefore request this Court to issue a temporary restraining order, and eventually a temporary injunction and permanent injunction, to prevent Defendant from penalizing, threatening, or otherwise retaliating against *ALL* Plaintiffs and Class Members by reason of their pursuit of this claim.

## VIII.        DEMAND FOR JURY

99.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial in the above-entitled action.

## IX.  CLASSWIDE PRAYER FOR RELIEF

100.     Plaintiffs ask for judgment against Defendant, as follows:

a.    Injunctive relief including specific performance and incidental damages.

b.    Declaratory relief.

c.    That the Court certify one or more classes and appoint Plaintiffs as class representatives and their counsel as class counsel.

d.    That the Court award Plaintiffs incentive awards for bringing this action.

e.    Attorney fees and expenses.

f.    All other relief the Court deems appropriate.

Dated: March 10, 2015

**THE HAYES LAW FIRM, PC**

s/ Debra Brewer Hayes

_____
DEBRA BREWER HAYES
State Bar No. 05656790
CHARLES CLINTON HUNTER
JIGNA PATEL
700 Rockmead, Suite 210
Kingwood, TX 77339
Telephone: (281)-815-4963
Facsimile: (832) 575-4759
dhayes@dhayeslaw.com
chunter@dhayeslaw.com
jvachhani@dhayeslaw.com


Carl R. Roth
State Bar No. 17312000
cr@rothfirm.com
Brendan C. Roth
State Bar No. 24040132
br@rothfirm.com
THE ROTH LAW FIRM, P.C.
115 N. Wellington, Suite 200
Marshall, Texas 75670
Telephone: (903) 935-1665
Facsimile: (903) 935-1797


**ATTORNEYS FOR PLAINTIFFS**

### VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF GREGG | § |

BEFORE ME, the undersigned notary public, appeared Sammy D. York, whose identity is known to me and who upon being duly sworn deposed and said:

"My name is Sammy D. York. I am over the age of eighteen and of sound mind, and I am fully competent to make this affidavit. All facts related to my individual case stated herein are within my personal knowledge and are true and correct. As to the depositions, certain documents and affidavit testimony of others cited to herein, I do not have personal knowledge but I believe these documents to be true and correct.

"I am a plaintiff in the above-styled lawsuit. I have read the forgoing Class Action Complaint for Breach of Contract, Declaratory Judgment and Injunctive Relief Including Specific Performance and Application for Temporary Restraining Order and Preliminary Injunction. The facts regarding my individual case are within my personal knowledge and are true and correct. As to the depositions, certain documents and affidavit testimony of others cited to herein, I do not have personal knowledge but I believe these documents to be true and correct."

Further affiant sayeth not.

_____
Sammy D. York, Affiant

SUBSCRIBED TO AND SWORN BEFORE ME, the undersigned notary public, on this ___ day of March, 2015.

SEAL
NOTARY PUBLIC
STATE OF TEXAS
DARLA ENGLISH
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires  10-29-2018

_____
Notary Public, State of Texas